Filed 1/12/21  McMillan v. Holstrom, Block & Parke CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SCOTT R. McMILLAN,<br><br>    Plaintiff, Cross-defendant and Appellant,<br><br>         v.<br><br>HOLSTROM, BLOCK & PARKE, APLC et al.,<br><br>    Defendants, Cross-complainants and Respondents. | G058723<br><br>(Super. Ct. No. 30-2018-00980001)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Thomas A. Delaney, Judge.  Affirmed.

Richard V. McMillan for Plaintiff, Cross-defendant and Appellant.

Collins Collins Muir + Stewart, Howard Franco, Jr., David C. Moore and Rada Feldman for Defendants, Cross-complainants, and Respondents.

## INTRODUCTION

Writers in training are often told to "show, don't tell" – allow the reader to experience the story through action rather than being spoon-fed it in narrative. "Show, don't tell" is also good advice for lawyers. Indeed, "show, don't tell" is a defining skill in trial advocacy and especially important in plaintiff's civil litigation. A plaintiff cannot merely *say* he has a claim; he must actually *prove* it. He must "show" his evidence, rather than "tell" through his allegations.

One area in which "show, don't tell" becomes especially important is legal malpractice. When a legal malpractice plaintiff premises his claim on negligence in litigation, he cannot merely allege that he would have gotten a favorable outcome but for the attorney's negligence, he must show he would have achieved a better result in the underlying litigation; this is done via the "case-within-a-case" methodology. (See *Marshak v. Ballesteros* (1999) 72 Cal.App.4th 1514, 1519; see also *Orrick Herrington & Sutcliffe v. Superior Court* (2003) 107 Cal.App.4th 1052, 1057.)

In this malpractice case, the plaintiff failed to "show" rather than "tell," and the trial court consequently granted summary judgment against him. We affirm.

## FACTS

Appellant Scott R. McMillan and Liyan McMillan (née Liu) married in October 1999. The couple had one child together, a daughter born in 2002. Scott[1] occasionally worked abroad, in places such as Iraq, Kuwait, and China, where he and Liyan met.[2] During the course of their marriage, the couple acquired two residences, a condominium in Rancho Santa Margarita and a home in Norco used for rental income.

---

[1] We refer to appellant and his ex-wife by their first names only for ease of reference. No disrespect or familiarity is intended.

[2] Appellant apparently works in the aerospace industry.

They began experiencing problems and decided to separate at some point around 2008-2010.[3]  Scott moved into the home in Norco, while Liyan stayed on in the condominium.  On January 29, 2014, Liyan filed for divorce in Orange County Superior Court based on irreconcilable differences.  She sought physical custody of their daughter (then 11 years old) with appellant to get visitation rights.  Appellant was initially represented by Attorney Ralph Hansen but then substituted himself in propria persona in November 2014.

An initial stipulation was reached – and order entered – regarding custody and child support on March 17, 2014.  Appellant, represented by Hansen, agreed to pay child support in the amount of $780 per month in bi-weekly payments of $390, starting April 1, 2014.  There was also a child support arrearage at the time of $1,360, which appellant was to pay at the rate of $75 per month beginning the same date.  The couple agreed to joint custody of their daughter.

*Braun's Representation of Scott in the Divorce Case*

On January 13, 2015, Scott signed a retainer agreement with respondent Marie Braun of the Law Offices of Marie I. Braun, which required a retainer fee of $5,000[4] and designated a $300 hourly rate.  More than two weeks later, on January 29, 2015, Braun substituted in as Scott's attorney in the marital dissolution case.

Scott retained Braun right around the time he was seeking a modification of his child support payments.  On January 8, 2015, the Orange County Department of Child Support Services filed a notice of motion for modification of child support in the family law case, averring that Scott had notified the department of a material change in his financial circumstances.  A hearing on the motion was scheduled for February 11, 2015.

---

[3]     Appellant claims he decided to take a job in Iraq in 2008 because he and his wife had agreed to take a break from one another.  Ultimately, the two agreed on a separation date of February 14, 2010.

[4]     Scott claimed the retainer fee was $2,500, but this is not what was provided in the written agreement.

On January 21, 2015, Scott, in propria persona[5], filed an income and expense declaration, indicating he had been unemployed since finishing a job for SpaceX Technologies (SpaceX) in July 2014. His only listed income was $3,706.30 per month in workers' compensation benefits with only $100 in cash in his bank accounts. His listed monthly expenses totaled just over $3,500 per month.

Scott's workers' compensation claim was based on plantar fasciitis in his right foot from climbing ladders at SpaceX. The foot pain became severe enough to require a visit to the company clinic in June 2014, and he was laid off shortly thereafter. He received temporary disability payments, which ended in December 2014 when SpaceX's workers' compensation carrier, Chubb, notified him that his condition had reached maximum medical improvement. A qualified medical examination (QME) report issued May 12, 2015, would later show Scott had zero percent impairment.[6]

A hearing on the request for modification was held on June 24, 2015 with Braun representing Scott. Scott testified he was receiving money from his parents as a loan. According to Braun, Scott had never told her the money he was receiving from his parents was a loan, and he had never provided her with documentation demonstrating his inability to work.

It turned out Scott's parents were helping their son in more ways than one. Scott's father, Richard, a lawyer, assisted him through the divorce, accompanying him to meetings with Hansen and then Braun and reviewing documents Scott brought to his attention. Scott stated that when he took the job in Iraq after separating from Liyan, he established a separate bank account at Washington Mutual and made his father a

---

[5]     The record is unclear as to why Braun did not file this document given that she had been retained by him eight days prior.

[6]     The QME reports indicated Scott was still complaining of pain despite the usual treatments, and he claimed he could no longer walk, stand, or climb ladders like he used to without pain. The examining physician recommended use of orthotics and additional treatments, though he did not think these treatments would be necessary for more than another year or two. Presumably, there was nothing preventing Scott from pursuing employment that did not involve being on his feet.

signatory. He also changed his power of attorney from Liyan to Richard. But because the couple still had joint expenses which required his income, Scott instructed Richard to pay Liyan the sums she needed on a monthly basis through the Washington Mutual account. He also told Richard to continue his efforts to cause a lot split on the Norco property in order to construct a residence there and otherwise act on his behalf while he was overseas.

The family court ordered a reduction in Scott's child support payment – from $780 to $605 per month, along with $10 per month on his arrears. The court used $3,505 as Scott's monthly income, presumably because of the money he was receiving from his parents.

The trial was set for January 6, 2016. In August 2015, Scott gave Braun $5,000 to retain a forensic accountant in order to trace certain funds that he claimed Liyan had transferred from the Washington Mutual account without his knowledge or permission.[7] However, Braun did not actually retain the expert, certified public accountant Jack M. White of White, Zuckerman, Warsavsky, Luna & Hunt, LLP, until January 4, 2016, just two days prior to trial. When the trial date came, Braun advised Scott she was ill and the trial date was continued to July 20, 2016.

In the months prior to the new trial date, Scott attempted to contact Braun, but he did not feel progress was being made. He asked Richard to send letters to Braun, which Richard did on May 2 and May 25. In the letters, Richard seems very concerned as to whether Braun is committed to the case. He inquires as to whether Braun has retained a forensic accountant and expresses interest in knowing the findings. Richard sent another letter on June 7, 2016, seeking a meeting in preparation for the upcoming trial date. It does not appear Braun ever wrote any responses to these letters, but she finally granted Scott and Richard a meeting in late June 2016.

---

[7]     Liyan denied doing any such thing, and said Scott only mentioned the missing funds after she had filed for divorce.

Braun had, in the ensuing time, joined the law firm of respondent Holstrom, Block and Parke, APLC (HBP) as an associate. She asked Scott and Richard to meet her at HBP's office where she presented Scott with a new representation agreement, which he reviewed and signed. The representation agreement provided for an hourly rate between $300 and $600 with $20,000 retainer. Scott and Richard paid $2,500 up front toward the retainer. The balance was to be paid "by way of a Family Law Attorney Real Property Lien," or FLARPL, against the Norco property. The lien was for the full $20,000. The agreement also contained a provision by which Scott would waive any objections to monthly billing if he did not raise them in writing within 20 days of receiving bills.

Scott claimed he signed the new retention agreement because he did not want to have to look for new counsel so close to trial.[8] He also claims he asked Braun prior to signing whether she was ready for trial and how much it would cost him to go through one. He says she responded that it would cost between $5,000 and $7,000 and she was ready.

Braun disputes this. She claims she never made any statements to him that the case would be ready for trial on July 20, 2016 or any other date, and she *never* represented that Scott would pay a rate *different from* what was provided in the representation agreement.

Scott was called to the HBP offices on June 24, 2016 and there, he signed the FLARPL, which was to be recorded against the Norco property, a notice of FLARPL, and a FLARPL agreement. Richard was not present at this meeting and Scott did not ask him to review the documents because he believed he would only have to pay $7,000 for the representation.

---

[8] One issue remains disputed – did Scott have to sign the agreement on the spot or did he have time to review it? Scott claims he was presented with the new retention agreement on June 23, 2016, and was told he had to sign that day or Braun would withdraw. Braun claims Scott had the new agreement by June 20, 2016, so he could review it prior to signing. Scott's signature on the agreement is dated June 23, 2016.

On July 19, 2016, White contacted Braun to give an initial report on his findings. He noted a number of cash withdrawals from Scott's bank account. He was unable to opine as to whether there was anything wrong with the transactions. Braun decided the best course was to appoint him as an impartial accountant in order to streamline accounting issues in a less expensive and more efficient manner.

Scott was surprised to learn on the day of trial that the forensic accounting examination was not yet complete. Braun advised him that a continuance of trial was necessary because the biggest issue in the case was the alleged money missing from the Washington Mutual account.

The parties stipulated to continue the trial to September 21, 2016; they agreed the trial would resolve issues related to accounting, 401(k), visitation for the child, and the disposition of marital real property. They further agreed to work to have the Norco property appraised and to submit within 10 days any 401(k) accounts for evaluation with an actuarial service in order to determine the separate and community interests in those accounts. Scott agreed to make reasonable efforts to locate withdrawal slips for the Washington Mutual (now Chase Bank) account between 2007 and 2009 when he was in Iraq.

Braun stipulated with Liyan's counsel, Anne Marie Healy, to submit the accounting issues to White, and the family court appointed him a referee on the issue, with a report due on August 19, 2016. Scott claims Braun never discussed this with him, and he would have been uncomfortable with it had she done so. He did not like the idea of paying for an expert knowing he would work with his former wife and her counsel. But he says he was later told Healy had agreed to split White's referee fees.

This was not quite accurate. The appointment order indicated the parties would agree on how to pay White and in the meantime, Scott would advance the fees subject to a reallocation at trial. Braun said she did it this way because Scott would have

7

a better argument to split the fees at the time of trial if White was a neutral. But when the September trial date came, Healy filed a declaration opposing sharing White's fees.

On August 19, 2016, White reported to Braun and Healy that he had looked through all the documents he had collected thus far and narrowed the transactions requiring further investigation to a short list of cash withdrawals. He understood information had been requested from the bank and wanted to wait for it.[9]

On September 2, 2016, White again reached out to Braun and Healy to report that he was still unable to opine that Liyan had "managed the funds under her control inappropriately," especially because Richard had power of attorney to withdraw funds from the Washington Mutual/Chase account. Chase Bank produced the withdrawal slips on September 20, 2016, which showed Richard had made the withdrawals White had identified.

Richard says he received copies of the bank's production on September 20, 2016, including the withdrawal slips with his name on them. Braun never asked him to explain them, but his practice had been to go to the bank with Liyan whenever she needed funds to pay family expenses so they could withdraw what was needed. Liyan had testified to this in her deposition. He also withdrew $19,000 to pay for costs involved in the lot-split in Norco.

Both sides filed trial briefs. Liyan sought the following: (1) half the fair rental value of the Norco property for the six years that Scott had had been residing there, or approximately $36,000, (2) sale of the Norco property and division of the proceeds, (3) reimbursement of monies related to community vehicles, (4) $3,224 in cash from the community bank accounts, and (5) attorney fees and costs incurred by continuances purportedly caused by Scott. She also denied "taking" any money from the Washington

---

[9]     As it played out, Liyan and Healy had to subpoena the bank's records on the withdrawals. It's unclear why Scott did not obtain and produce those documents, given that he was the accountholder and the stipulation required him to make efforts to do so. Braun says Scott "claimed he didn't have these records," but there would presumably have been no obstacle to his requesting them from the bank.

8

Mutual/Chase account. She said Richard had withdrawn funds; she was merely paying bills, and she had offered to prove as much to Scott.

Liyan filed two property declarations prior to trial. The first, filed July 18, 2016, disclosed the following items – the Norco property, valued at $357,142, and a 401(k) account worth $9,673. The second, an amended property declaration filed July 19, 2016, showed the Norco property and changed the value in her 401(k) account to $36,000. It also added several community bank accounts worth over $60,000. The Norco property would ultimately be appraised at $323,000.

Braun and HBP filed a brief on Scott's behalf. It indicated he was unemployed and "struggling with a work related condition," presumably his foot issue. The Norco property, which had been rented out during the couple's marriage, was left in an uninhabitable condition and required repairs. Once Scott moved in, around March 2010, he made nearly $20,000 in repairs and capital improvements, which he wished the court to take into consideration. He sought division of furnishings valued at around $3,000, three vehicles, nine bank accounts (including the Washington Mutual/Chase account at issue), a Fidelity Investments account worth $5,000, three retirement accounts totaling $20,673, and a division of community debts totaling approximately $175,000.

The Rancho Santa Margarita condominium was also an issue for Scott. After Scott moved out in 2010, he claimed Liyan had allowed the loan on it to go into default, resulting in a May 2011 foreclosure sale and a nearly $172,000 deficiency judgment that comprised the principal portion of the community debt. He wanted her to be charged for her use of the residence from September 2010 (when he said she stopped making mortgage payments), through May 2011, and he asked that she be held responsible for the entire deficiency judgment.

Scott also claimed the couple had accumulated nearly $200,000 in community funds while he worked abroad, and Liyan controlled those funds before and after the separation. He said she had failed to account for $100,000 of those funds. Scott

9

believed the loss of the condominium and the $100,000 still unaccounted for represented breaches of Liyan's fiduciary duty. He requested Liyan assume responsibility for half his attorney fees and costs, including the cost of forensic accountants.

On September 21, 2016, Braun says she appeared for trial and the parties began settlement negotiations, resulting in the signing of a stipulation and order for judgment. But according to Scott, she was not at all herself that day. She seemed frightened and sat in a corner with her arms crossed, telling Scott that White had not completed his report and they were out of time. She said because they could not get another trial continuance, Scott would have to agree to a settlement or risk paying Liyan's attorney fees.

Healy drafted a settlement stipulation. Scott did not want to accept it because it did not give him any of the separate or community funds or 401(k) funds, it required him to pay White's fees, and it did not compensate him at all for the condominium or its loss. He wanted to go to trial but it was clear they were not ready.

He called Richard in a panic and asked him to come right away. When Richard arrived at the courthouse, he described Braun as being "literally wedged into a corner in the hall, with her arms crossed across her chest." She did not want to talk to him. He felt "there was [definitely] something wrong with her." When Scott described the situation regarding the case to his father in Braun's presence, she did not dispute his characterization.

Richard was asked to review the draft stipulation prepared by Healy and noticed the same issues Scott had noticed. However, because he believed, based on what his son and Braun were telling him, that there would be no further trial continuances and the referee's report was not complete, he felt there was no choice but to sign the draft stipulation if there was no way to go to trial that day. Scott took his advice and signed off.

10

The stipulation was entered into the court record.  It provided:  (1) Scott would get the Norco property and had to buy out Liyan's interest for $95,000 within 60 days or the property would be sold; (2) the FLARPL would remain on the Norco property but would not encumber Liyan's interest; (3) the issues related to the condominium foreclosure and any tax liability premised on that property would be reserved to the court's jurisdiction; (4) the court would also retain jurisdiction over the issues relating to disputed community funds; (5) the amounts Scott invested in the Norco property were accounted for in determining Liyan's buyout amount; (6) each party would receive their respective 401(k) accounts accrued through employment; (7) each party would bear its own attorney fees and costs; (8) Scott would serve a final declaration of disclosure and file proof of service of same within 24 hours; and (9) all prior orders would remain in effect and be incorporated into a formal final judgment to be prepared by Braun.  The trial judge signed off on the stipulation, indicating no final judgment would be entered until Scott's final disclosure form was filed.

According to Richard, Scott's final disclosure form was never served (Healy ultimately agreed to waive it) and Braun never prepared the final judgment.  According to Braun, she had trouble communicating with Scott and ultimately, she and HBP moved to withdraw as counsel.  Richard substituted in.

Richard ultimately prepared and filed the final judgment on June 27, 2017.  The division of community assets was to be pursuant to the parties' settlement.  Scott was to continue paying $605 per month in child support.  Liyan, Scott, Healy, and Richard all signed on.

Scott was clearly unhappy with the result.  He requested mandatory fee arbitration sometime around September 2017 contesting the attorney fees he had paid to HBP.  The arbitration was held on February 2, 2018, at which time it was adjudged that Scott owed HBP almost $27,000 in reasonably incurred attorney fees.  The panel also found Scott benefited by not having to pay the outstanding fees to Braun's solo practice.

11

*Scott Files a Lawsuit against Braun and HBP*

Rejecting the fee arbitration award, Scott (again represented by Richard) filed a complaint for legal malpractice against Braun, HBP, and respondent Dayn Holstrom, HBP's managing partner, on March 16, 2018. The complaint contained a cause of action for legal malpractice against all three respondents and a cause of action for rescission against HBP.

Scott's malpractice claim was premised on several alleged missteps by Braun. First, she was allegedly unprepared to present evidence of Scott's inability to pay child support at the modification hearing, and as a result, he was left on the hook for child support as well as arrears. Second, Braun had not been diligent in securing White's services or tracing community funds or 401(k) accounts, thus placing Scott in a disadvantageous position with respect to the division of these assets and making him liable for all of White's fees. Finally, Braun's failure to prepare adequately for trial dates forced him to enter into the settlement stipulation when he could have obtained his rightful share of the community assets if the case had gone to trial.

Scott sought rescission of the HBP retention agreement based on misrepresentation – namely, Braun's assurance that she was ready to take the case to trial in June 2016 for $7,000 – and alleged Braun and HBP had misrepresented this in order to obtain the FLARPL. He requested punitive damages against HBP.

The respondents filed answers. HBP also filed a motion to strike the punitive damages allegations and a cross-complaint for breach of contract and quantum meruit based on the unpaid fees.[10] The trial court granted HBP's motion to strike with leave to amend.

Scott timely filed his first amended complaint on August 27, 2018. It contained the same causes of action, but this time, the allegations supporting Scott's request for punitive damages were included under the malpractice cause of action. He also threw in an allegation that HBP had billed him for $30,000 worth work that was either not done or was duplicative. Otherwise, the first amended complaint was substantially similar to his previous complaint. Again, HBP filed a motion to strike the punitive damages allegations, and again the trial court granted the motion, this time without leave to amend, finding insufficient facts to suggest fraud, oppression, or malice.

Several months later, respondents jointly filed a motion for summary judgment or alternatively, summary adjudication as to each of the two causes of action. They contended Scott's was a "settle and sue" malpractice case, in the style of *Namikas v. Miller* (2014) 225 Cal.App.4th 1574 (*Namikas*). In such a case, the client alleges malpractice because he believes he could have gotten a better settlement or a better result at trial. To prove causation and damages in a settle and sue case, Scott would have to establish to a legal certainty that he would have received a better outcome but for the negligence.

This he could not do, respondents said. Braun and Holstrom submitted declarations in support of the motion. Liyan and Healy also both submitted declarations averring they would not have agreed to a different settlement. And because Scott's only evidence in support of his desired division of community assets was speculative, there was no certainty a trial judge would have ordered any different judgment. Moreover,

---

10      It would later dismiss the cross-complaint.

13

Scott and Richard had failed to pursue the funds-tracing and 401(k) issues after HBP substituted out of the case.

Scott opposed the motion by submitting his declaration and that of Richard. He did not present any new evidence regarding the child support, accounting, or community property issues. And when the day came for the hearing on the motion, he did not appear. The trial court ultimately granted summary judgment in defendants' favor, concluding that any breaches by respondent did not ultimately cause Scott any damages, and the rescission claim was defective because Scott could not restore consideration to respondents and, in any event, their alleged misrepresentations to him were non-actionable, good faith promises to perform in the future.

## DISCUSSION

Scott seeks review of the grant of summary judgment against him as well as the grant of the respondents' motion to strike punitive damages without leave to amend. We believe the trial court was correct to grant summary judgment, and consequently, the appeal as to the motion to strike is moot.

## I.      Standard of Review

When a trial court has granted summary judgment in favor of a defendant, our review is de novo, whereupon we undertake a three-step process: ""First, we identify the issues raised by the pleadings, since it is these allegations to which the motion must respond; secondly, we determine whether the moving party's showing has established facts which negate the opponent's claims and justify a judgment in movant's favor; when a summary judgment motion prima facie justifies a judgment, the third and final step is to determine whether the opposition demonstrates the existence of a triable, material factual issue."' [Citation.]" (*Claudio v. Regents of University of California* (2005) 134 Cal.App.4th 224, 229 (*Claudio*).)

**II.**       **Motion for Summary Judgment or Alternatively, Summary Adjudication**

"The complaint limits the issues to be addressed at the motion for summary judgment." (*Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1258.)  A defendant moving for summary judgment or summary adjudication has the burden to show that a cause of action has no merit or that a complete defense exists to that cause of action.  (See Code Civ. Proc., § 437c, subd. (p)(2).)  If that burden is met, the plaintiff must demonstrate the existence of an issue of material fact which requires trial.  (*Ibid*.)  While we strictly construe the moving party's evidence and liberally construe the opposing party's evidence, we presume the judgment is correct.  (See *Shiver v. Laramee* (2018) 24 Cal.App.5th 395, 400.)  Thus, the burden is on the appellant ""'to affirmatively demonstrate error and, therefore, to point out the triable issues the appellant claims are present by citation to the record and any supporting authority . . . ." [Citation.]'"  (*Id.* at p. 400, quoting *Claudio*, *supra*, 134 Cal.App.4th at p. 240.)

**A.**       **Legal Malpractice Claim**

A legal malpractice cause of action requires four elements: (1) attorney-client relationship giving rise to professional duty, (2) breach of that duty, (3) causation and (4) damages.  (See *Kurinij v. Hanna & Morton* (1997) 55 Cal.App.4th 853, 863.)  Here, we are concerned with the last two elements of the claim.  We must determine whether "'but for the lawyer's negligence, the client would have prevailed in the underlying action.' [Citation.]"  (*Id.* at p. 864.)

"To win a legal malpractice action, the plaintiff must prove damages to a legal certainty . . . .  Thus, a plaintiff who alleges an inadequate settlement in the underlying action must prove that, if not for the malpractice, []he would certainly have received more money in settlement or at trial.  (*Id.* at p. 1463.)  Such claims are likely to be speculative, as even the most skillful attorneys can seldom know whether they obtained the best possible result; thus they are held only to the standard of whether the

15

settlement was within the realm of reasonableness.  [Citations.]" (*Slovensky v. Friedman* (2006) 142 Cal.App.4th 1518, 1528.)

The Fifth District Court of Appeal recently concluded that a malpractice plaintiff could still prove the "legal certainty" of damages by a preponderance of the evidence standard – i.e., more likely than not.  (See *Masellis v. Law Office of Leslie F. Jensen* (2020) 50 Cal.App.5th 1077, 1094.)  Nonetheless, to avoid summary judgment, a malpractice plaintiff cannot merely assert he would have received a better outcome at trial.  He must "show 'what that better outcome would have *been*.' [Citation.]" (*Namikas*, *supra*, 225 Cal.App.4th at 1585, italics added.)[11]

With these principles in mind, we examine the four areas of potential malpractice identified by the first amended complaint.

### 1.  Child Support Payments and Arrears

Scott's first grievance is Braun's alleged failure to prove his inability to pay child support, leaving him with a $605 monthly payment and nearly $10,000 in arrears. Respondents argue that Braun actually helped Scott, rather than damaged him, because he was already liable for $780 per month in child support payments when Braun entered the case.  There were also over $1,000 in arrearages by that point.  This evidence was sufficient to shift the burden to Scott to show that respondents should have been able to reduce his liability further.

Scott says he was out of work and receiving loaned money from his parents at the time he requested a modification of his child support obligation.  He told the family court this information at the hearing, but he apparently produced no documents or other evidence to prove the money was a loan, rather than a gift.  Indeed, he told the family

---

11      Scott seems to suggest this is not a settle and sue case because he would have gone to trial but for the malpractice.  We do not see how this changes the landscape.  Theoretically, *any* settle and sue plaintiff would have proceeded with the underlying litigation if he or she was unable to reach an agreeable settlement therein.  That does not negate the settle and sue plaintiff's burden to show what the probable outcome of the trial would have been, based on competent evidence.

16

court it was his *assumption* the money was on loan. Clearly, the family court was not persuaded this was the case.[12]

In setting child support, a family court has the discretion to include in the obligor's income any money received as a gift on a regular basis from the obligor's parents. (See *In re Marriage of Alter* (2009) 171 Cal.App.4th 718, 737.) In the absence of any evidence Scott had to repay monies received from his parents – Braun claimed not to have seen any, and examining the record before us, neither do we – we cannot say she should have obtained any better result at the modification hearing.

Scott alleged in his pleading that Braun should have sought a continuance of the modification hearing or reset a new hearing in order to present evidence of his inability to pay. However, we see no evidence Scott was unable to pay child support. Along with the money received from his parents, the record indicates Scott was able to work – albeit not at a job where he would have to stand for long periods of time. He recounts no efforts of looking for desk work or other types of work in order to support himself. Given this evidence, it is not likely the family court would have changed its decision on child support.

### 2. Failure to Timely Retain Forensic Accountant

Scott's second grievance is that Braun failed to retain White, the accountant, until only two days before the January 2016 trial date, and they had to seek continuances while White undertook his review. Because he was not through with his review prior to the July 2016 trial date, Scott says, he was forced to allow White to serve as referee which gave his former wife and her attorney influence over the opinion ultimately rendered.

---

[12] And it appears to have been correct. When he gave deposition testimony in May of 2019, Scott indicated, as of that very date, he was still receiving money from his father to support himself. By this time, he was willing to acknowledge the money was a gift.

17

Respondents never disputed that Braun was late (and in our view, shockingly so) in retaining White, but they made two contentions on summary judgment. First, they asserted Scott can still raise the funds tracing issue with the family court because the issue was reserved to its jurisdiction in the September 2016 stipulation. Second, they say Scott has no evidence that getting White's report sooner would have changed the outcome. Liyan would not have agreed to a different settlement, and White's investigation ultimately showed that all withdrawals from the Washington Mutual/Chase account he flagged were made by Richard, not Liyan.

The first argument is the less persuasive. Yes, the September 2016 stipulation noted the existence of an ongoing dispute about the community funds and their whereabouts. But the stipulation is unclear as to the circumstances under which Scott could return to court on the issue. The stipulation states: "The court shall retain jurisdiction over the accounting of these bank accounts if respondent discovers additional accounts or that petitioner has come into a large sum of money, respondent may return to court on this issue." It is unclear whether this stipulation allows Scott to return to court on the accounting issue even if he does *not* discover additional bank accounts and even if Liyan does *not* come into a large sum of money.[13]

But we agree with respondents' second argument, that Scott never marshalled evidence to show he was damaged by the failure to timely retain White. First of all, Scott and Richard were working at cross-purposes with respect to the Washington Mutual/Chase account. When Scott returned from Iraq, he claims he went to withdraw funds from the account in order to build a residence on the Norco property only to find

---

[13]     Ambiguity is a common feature of run-on sentences.

18

that the money was gone. When he asked Liyan what happened to the money, she said she did not know. Thus was born the couple's dispute over the disappearing money.[14]

But apparently it did not occur to Scott to ask his *father* what happened to the money. If he had, he might have discovered that Richard had made a number of large withdrawals from the account, many of which were purportedly to assist Liyan with living expenses. Indeed, we are somewhat perplexed as to why Scott did not undertake an in-depth examination of his own bank account –including requesting documents from the bank – in order to determine what had happened to the money. It should not have required White's investigation to discover that Richard withdrew much of the money.[15]

The real issue requiring a forensic accounting investigation would have been tracing the use of the money withdrawn from the account. How were these monies spent? Does any of the money remain unspent? We have very little evidence to answer these questions, and it does not seem White ever got that far in his work before the stipulation was signed. In our view, that is just as much the fault of Scott, the accountholder, as it is his counsel's. To be sure, Braun was late in retaining White, but once retained, it does not appear he was given much in the way of assistance from the client he was serving.

Moreover, after Braun and HBP's withdrawal from the case, it was incumbent upon Scott and Richard, his new counsel, to take up the White investigation where it left off – to trace the funds withdrawn by Richard and given to Liyan. While Richard testified he requested White's file, he never contacted White and, it seems, never hired or consulted a new expert to assist in tracing the missing money. As a result, Scott

---

[14] To the extent Scott's earnings from Iraq were made prior to the agreed-upon date of separation, they were presumptively part of the community estate. (See Fam. Code, §§ 760 & 771, subd. (a).) And, in any event, he instructed Richard to give Liyan money from that account as needed for community expenses while he was abroad.

[15] And we note again, White did not receive documents from the bank until early September 2016 because Scott failed to obtain them from the bank himself.

19

is unable to "show" that Liyan misappropriated any community funds at all, let alone that a timely expert retainer would have uncovered it.

### 3. Referee's Fees

Scott's third grievance is that he was on the hook for all of White's referee's fees and Braun failed to get Liyan to pay half. White was appointed a referee under Code of Civil Procedure section 638. Therefore, the payment of his fees was a matter to be settled by agreement of the parties, and barring that, a ruling from the court. (See Code Civ. Proc., § 645.1.) The appointment order indicated Scott would advance the fees subject to a reallocation at trial. But the stipulation and final judgment make no mention of the allocation of White's fees. Even though Liyan may not have been willing to stipulate to split his fees, the judgment reserves jurisdiction over "all other issues," so presumably, Scott could still go back to the family court and ask to split them. He has certainly not been ordered to pay them from what we can see in the record. As such, there is no damage from the referee's fees that we can ascertain.[16]

### 4. Division of Funds in Community Bank Accounts

Scott alleged he would have received his 50 percent share of the community bank accounts but for respondents' negligence. Respondents never squarely addressed this precise question in their summary judgment motion. However, the issue appears to have been left open by the September 2016 stipulation. That stated a dispute existed as to the "use of community funds maintained in multiple bank accounts, the tracing of the funds and the accounting of same." To our reading, this language refers to the dispute over the missing money Scott earned while in Iraq. It does not purport to assign all of the community bank accounts to Liyan or foreclose Scott's claim to any divisible community funds in those accounts. No other reference is made to the division

---

[16] We also observe that White started out as Scott's own expert, and Scott would have been required to pay his fees anyway. However, we recognize that Scott's concern was with White's appointment as a referee, which allowed him to communicate with Liyan and her counsel.

of the bank accounts in the stipulation or judgment. Thus the trial court's jurisdiction as to the division of community bank accounts would appear to be reserved, and Scott may return to court to raise this issue. There has been no *loss* in this regard.

### 5. Division of 401(k) Accounts

Finally, Scott claims he should have received half the funds in the couples' 401(k) accounts. The parties' stipulation assigned each spouse "their respective 401k accounts accrued through employment." Respondents contend Liyan would never have agreed to split the 401(k) accounts down the middle, and Scott has not provided evidence to show that a 50 percent division of the 401(k) accounts would have been a more advantageous disposition for him. We agree.

Scott seemingly did not undertake any valuation of his and Liyan's 401(k) accounts to determine how much of them could have been characterized as community property and how much each of their accounts was worth. Without doing that analysis, it is impossible to determine whether it would have been worth incurring taxes and penalties in withdrawing funds from any of the accounts as part of the division of assets. The absence of such an analysis also makes it impossible to compare the value of his community share of the 401(k) accounts with other community assets he *did* receive, for example, the Norco property. Therefore, Scott is unable to "show" that he was damaged by the term in the stipulated settlement assigning the respective spouses their own 401(k) accounts.

All of which leaves us in agreement with the trial court that the legal malpractice claim was fatally lacking.

### B.       Rescission Claim

Scott's second cause of action, for rescission, is based on a claim of intentional or negligent misrepresentation: Braun represented she was ready for trial in July 2016 when she was not, and she told Scott it would not cost more than $7,000 to take the case to trial. A party to a contract may rescind if his consent to the contract "was

21

given by mistake, or obtained through duress, menace, fraud, or undue influence, exercised by or with the connivance of the party as to whom he rescinds, or of any other party to the contract jointly interested with such party." (See Civ. Code, § 1689, subd. (b)(1).) However, "to effect a rescission a party . . . must, promptly upon discovering the facts which entitle him to rescind," unless he is under duress, menaced, or otherwise unaware or unable to invoke his right to rescind, give notice and "[r]estore to the other party everything of value which he has received from him under the contract or offer to restore the same upon condition that the other party do likewise, unless the latter is unable or positively refuses to do so." (See Civ. Code, § 1691, subd. (b).)

Respondents argued rescission was not available because Scott could not "restore" to them the legal services rendered, citing case law discussing so-called "partial rescission" [17] and also the case of *Olson v. Cohen* (2003) 106 Cal.App.4th 1209, 1216 (*Olson*). They further argued there was no actionable misrepresentation of existing fact regarding Braun's readiness for trial or what it would cost.[18]

We are skeptical of respondents' argument regarding restoration of consideration. In *Olson*, the plaintiff could not make a rescission claim against his attorney because he could not restore services rendered. (*Olson, supra,* 106 Cal.App.4th at p. 1216.) But he was not suing for malpractice; he was suing for claims based on the lawyer's failure to register with the State Bar. (*Id.* at p. 1212.) The *Olson* court found this fact relevant: ". . . the equities of the present case do not support disgorgement of fees . . . . Appellant does not challenge the services as negligently rendered." (*Id.* at p. 1216.) Here, the appellant does indeed challenge the services as negligently rendered.

---

[17] On appeal, respondents have seemingly dropped their argument from the trial court that rescinding the fee agreement would amount to an improper partial rescission, and thus we do not address the cases cited in the trial court for that proposition.

[18] In their brief on appeal, respondents add a new argument – rescission is not a cause of action itself, but rather an equitable remedy. This was not respondents' argument before the trial court; we will not address it here. (See *In re Marriage of Nassimi* (2016) 3 Cal.App.5th 667, 695 [generally, "theories not raised in the trial court cannot be asserted for the first time on appeal[.]"].)

22

Rescission seems inequitable where competent services are rendered; not so much where services are sub-optimal. There is at least an argument to be made here that they were the latter.

Additionally, Scott directs us to *California Farm & Fruit Co. v. Schiappa-Pietra* (1907) 151 Cal. 732, in which the California Supreme Court recounts exceptions to the rule of restoration. These include circumstances in which an accounting is required in order to determine the relative rights of the parties, or where one party is unable to restore what is received (as would seemingly be the case here). (*Id.* at pp. 740-741.) We cannot see that rescission is an impossible remedy in this case – otherwise, no malpractice plaintiff could ever seek rescission of a fee agreement.

However, respondents' second argument carries the day. Scott has not shown that he was damaged by Braun's representation in June 2016 that she would be ready for trial in July, because the matter was continued from that date. Indeed, we cannot say whether this representation was false when it was made. The July trial date had to be continued because White's review was not complete. But there is no indication Braun knew this would be the case beforehand. Indeed, in his July 19, 2016 e-mail, White indicated he had "examined a large volume of bank statements and expense information." He had clearly been preparing for trial.

As to the alleged misrepresentation that Braun could try the case for $7,000, Scott has provided no evidence of what a reasonable estimated cost of trial should have been. But even if it was not a reasonable estimate, Scott admitted in his deposition that he received invoices exceeding that amount in August – only two months later – and never objected. And Braun stated she never heard any objections from Scott after sending him bills. For this reason, Scott's attempt now to take issue with the bills is a fruitless endeavor. The fee agreement required him to raise such objections within 20

days or they would be waived.  "The law helps the vigilant, before those who sleep on their rights."  (Civ. Code, § 3527.)[19]

We conclude the trial court was correct to enter judgment in respondents' favor.

## DISPOSITION

The judgment is affirmed.  Respondents to recover their costs on appeal.


BEDSWORTH, ACTING P. J.

WE CONCUR:


FYBEL, J.


THOMPSON, J.

---

[19]     Here, we cannot help noting with some measure of concern that Scott failed to make any appearance at the hearing on the summary judgment motion.  Nor did he, apparently, contact the trial court to either submit on the tentative or continue the hearing so he could appear.